## S07A1906. McKNIGHT v. THE STATE.
(656 SE2d 830)

MELTON, Justice.

In bifurcated trials, Anthony McKnight was convicted for the murder, felony murder, aggravated assault, and armed robbery of Rosendo Urban and the murder, felony murder, aggravated assault, burglary, and armed robbery of Gary Horning.[1] McKnight now appeals both verdicts, contending, among other things, that the evidence was insufficient and that improper evidentiary rulings were made in both trials. For the reasons set forth below, we affirm.

## URBAN MURDER

1. On December 6-10, 2004, McKnight was tried for the crimes committed against Urban. With regard to these crimes, the record, when viewed in the light most favorable to the verdict, shows that, on the morning of August 17, 2002, Urban's body was found in his brother's truck parked outside an apartment complex. Urban had been shot three times with a .25 caliber weapon, the bullets from which were recovered at the scene. When Urban's body was found, it was discovered that his cell phone and wallet containing $1,000 had been stolen. On the same morning as the murder, McKnight gave Urban's cell phone to Dwight Varner with instructions for Varner to "get rid of" the phone and not to be "caught with it." At the time, McKnight was carrying a .25 caliber handgun, and he showed Varner approximately eight or nine one hundred dollar bills, stating, "I

---

[1] McKnight was indicted in Fulton County for both sets of crimes on June 25, 2004. With regard to the Urban murder, McKnight was indicted for malice murder, three counts of felony murder, aggravated assault, armed robbery, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. Following a jury trial conducted on December 6-10, 2004, McKnight was found guilty on all counts, and the trial court sentenced him to life imprisonment for malice murder and five consecutive years for each count of possession of a handgun. The felony murder counts were vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). All remaining counts were also merged into the malice murder conviction for purposes of sentencing. With regard to the Horning murder, McKnight was indicted for malice murder, three counts of felony murder, aggravated assault, armed robbery, burglary, possession of a firearm by a convicted felon, and possession of a firearm during the commission of a felony. A jury trial was conducted on December 14-20, 2004, and McKnight was convicted on all counts. Thereafter, the trial court sentenced McKnight to a consecutive term of life imprisonment for malice murder as well as five consecutive years for each count of possession of a firearm. The felony murder counts were vacated by operation of law. *Malcolm*, supra. All remaining counts were merged into the malice murder conviction. McKnight's motion for new trial, filed on January 4, 2005 and amended on March 16, 2006, was denied in orders issued on August 4, 2006 and December 15, 2006. On May 22, 2007, the trial court granted McKnight's request for an out-of-time appeal, and McKnight filed a notice of appeal on June 18, 2007. His appeal was docketed in this Court on August 27, 2007, and submitted for decision on the briefs.

caught my man." Varner used Urban's cell phone for some time, and then he sold it to another party. Police ultimately recovered the cell phone.

At the time of the murder, McKnight often stayed in an apartment with his girlfriend, Taiwanna Brooks, his friend, Larry Simpson, and Simpson's girlfriend, Jacqueline Williams. At the apartment, police recovered a videotape that had been filmed by Simpson around the time of Urban's murder in which McKnight can be seen walking around and shooting a handgun into the air. A crime lab expert on firearms determined that, based on its size and shape, the weapon had the distinctive characteristics of an Italian-made Tanfoglio handgun, which is manufactured only in .22 and .25 caliber sizes. In addition, Williams gave a statement to police in which she told them that she had seen McKnight carrying around a silver .25 caliber handgun on numerous occasions.

This evidence was sufficient to enable the jury to conclude that McKnight was guilty of the crimes against Urban beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979); see also *Brooks v. State*, 281 Ga. 514 (1) (640 SE2d 280) (2007) (affirming conviction based on circumstantial evidence).

2. McKnight contends that the trial court erred by admitting certain prior inconsistent statements made by Williams as both impeachment and substantive evidence.

The record shows that, when asked whether she had previously seen McKnight in possession of a .25 caliber gun, Williams testified that she had only seen McKnight with a gun at one point while he was inside her apartment. She further testified that she was unsure of the size or caliber of the weapon. Williams was then presented with a prior inconsistent statement she made to Detective Daniels during the murder investigation. Williams was allowed to review the statement in its entirety, and she testified that it was, in fact, her statement and that she remembered giving the statement to Detective Daniels. Williams further indicated that the prior statement that she had given was fair and accurate. The State then reminded Williams that, in her prior statement, she had informed police that she knew that McKnight possessed a .25 caliber handgun and that she had seen him with it on several occasions.[2] Williams was given

---

[2] In her prior statement, Williams indicated that she was very familiar with McKnight's gun and that she had seen him with it on a number of occasions. Among other things, Williams stated that "there were lots of times that [she] saw [McKnight] with a little silver .25 caliber gun," that McKnight had, at one time, asked her to buy .25 caliber bullets for his gun, and that McKnight had sold the gun shortly before the police investigation.

ample opportunity to explain her prior answer and remained equivocal about her ability to identify the gun. Williams was then allowed to leave the stand, but she was informed that she was subject to recall.

Later in the trial, Detective Daniels was called to the stand, and he was allowed to read the entirety of Williams' prior inconsistent statements into the record. Prior to the admission of this evidence, McKnight objected on two bases: (i) that the prior inconsistent statement should have been read into the record while Williams was still on the stand and (ii) that an insufficient foundation had been laid for the introduction of the prior inconsistent statement.

(i) With regard to the subsequent admission of Williams' statement through Detective Daniels, McKnight appears to contend that this procedure violated *Crawford v. Washington*, 541 U. S. 36 (124 SC 1354, 158 LE2d 177) (2004). *Crawford*, however, relates to the testimonial hearsay of a witness who is unavailable for cross-examination at trial. Here, Williams was not unavailable. To the contrary, she had already testified at trial and remained subject to recall. Therefore, contrary to McKnight's contentions, *Crawford* is not applicable to this case.

(ii) McKnight also contends that the State failed to lay the proper foundation for the admission of Williams' prior inconsistent statement. OCGA § 24-9-83 provides:

> A witness may be impeached by contradictory statements previously made by him as to matters relevant to his testimony and to the case. Before contradictory statements may be proved against him . . . the time, place, person, and circumstances attending the former statements shall be called to his mind with as much certainty as possible. If the contradictory statements are in writing and in existence, they shall be shown to him or read in his hearing.

In this case, Williams was presented with her prior contradictory statement, and she was allowed to fully review it after being reminded of the time, place, person, and circumstance of the statement. After this review, Williams testified that she was both familiar with the statement and that it was fair and accurate, although she continued to question its contents. Under these circumstances, an adequate foundation was laid for the statement to be used as impeachment evidence, and, since Williams was available at trial for cross-examination, the statement could also be admitted as substantive evidence for the jury's consideration. *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982).

## HORNING MURDER

3. Following his conviction for the crimes against Urban, McKnight was tried on December 16-20, 2004, and convicted for the murder of Horning. When viewed in the light most favorable to the verdict, the record shows that, at approximately midnight on July 3, 2002, Horning was murdered in his hotel room by someone using a .25 caliber weapon, and his wallet was stolen. Around that time, a security guard witnessed a green Ford Taurus arrive at the hotel, heard a series of "caps," and then saw the Taurus drive away. As the Taurus drove away, the individual sitting on the passenger's side appeared to be agitated. Evidence showed that McKnight sometimes borrowed his sister's green Taurus which was found abandoned on the highway on July 26, 2002. The security guard from the hotel was shown this car, and he stated that it looked like the one that he had seen on the night of the murder. Charlotte Martin, a homeless woman who frequented the area around the hotel, witnessed McKnight fleeing the scene shortly after the shots were fired.[3] Gerardo Daniels, an acquaintance of McKnight, testified that, on the evening of July 2, 2002, McKnight mentioned to him that he was going to get some money and flashed a .25 caliber handgun. McKnight invited Daniels to participate in the robbery, but Daniels declined. Daniels next saw McKnight at 4:00 a.m. on July 3, 2002, and McKnight told him that he had just killed a man who had "disrespected him." A crime lab technician testified that the bullets which killed Horning came from the same gun which killed Urban. In addition to this evidence, the murder of Urban, for which McKnight had been recently convicted, was introduced as a similar transaction.

This evidence was sufficient to enable the jury to conclude that McKnight was guilty of committing the crimes against Horning for which he was convicted beyond a reasonable doubt. *Jackson*, supra; *Brooks*, supra.

4. McKnight contends that the trial court erred by introducing his conviction for the murder of Urban as a similar transaction, arguing that the evidence supporting the Urban conviction was insufficient. As determined above, however, the evidence was not insufficient. Furthermore, the introduction of the Urban conviction to show McKnight's bent of mind and course of conduct was proper in this case. See *Williams v. State*, 261 Ga. 640 (2) (409 SE2d 649) (1991).

---

[3] Although Martin was deceased at the time of trial, McKnight opened the door to the admission of her statements by asking a police officer who took the stand whether there had been any witnesses to the murder.

5. McKnight contends that the trial court erred by allowing the state to cross-examine him regarding prior rape allegations that had been made against him and Daniels. The record shows that McKnight testified on direct that he had never associated with Gerardo Daniels and had no dealings with him. On cross-examination, the prosecutor asked McKnight whether he and Daniels had robbed and raped a woman on June 13, 2002. The trial court properly allowed the state to question McKnight about this issue to show that he did have a relationship with Daniels. This was proper impeachment testimony. See *Williams v. State*, 257 Ga. 761 (4) (363 SE2d 535) (1988).

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 28, 2008.

*R. Gary Spencer*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Christopher M. Quinn, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Elizabeth A. Harris, Assistant Attorney General*, for appellee.